LYNNE C. HERMLE (STATE BAR NO. 99779)
JESSICA R. PERRY (STATE BAR NO. 209321)
JULIA COLLINS RIECHERT (STATE BAR NO. 254078)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:  650-614-7400
Facsimile: 650-614-7401
lchermle@orrick.com
jperry@orrick.com
jriechert@orrick.com

Attorneys for Defendant
GAP INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIENNA HOWARD, individually and on behalf of all similarly situated individuals,<br><br>    Plaintiff,<br><br>  v.<br><br>GAP INC.,<br><br>    Defendant. | Case No.  C 06 6773 WHA<br><br>**DEFENDANT GAP INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION**<br><br>Date: November 5, 2009<br>Time: 8:00 am<br>Courtroom:  9<br>Judge:  The Honorable William Alsup |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND ....................................................................................... 2

    A.   Gap's New York Operations .............................................................................. 2

    B.   Gap's 14 Versions of the Dress Code Policy ..................................................... 3

    C.   Training on the Dress Code Varies By Store ..................................................... 7

    D.   Gap's Efforts to Ensure Employee Understanding of the Dress Code ................. 8

        1.   Gap Reminded Employees Wearing Gap Was Not Required.................... 8

        2.   Gap's Dress Code Posters Specifically Include Non-Gap Clothing ........... 9

        3.   Gap's Various Methods to Report Dress Code Concerns ......................... 9

    E.   The Enforcement of the Dress Code Varies by Store .......................................... 10

    F.   Gap's Generous Employee Discount .................................................................. 10

        1.   The Discount Policy for Employees And Family Members .................... 10

        2.   The Tracking of Purchases Made with the Employee Discount .............. 11

    G.   Plaintiff's Employment with Gap ...................................................................... 11

III. ARGUMENT .............................................................................................................. 14

    A.   The High Legal Standard Precludes Class Certification ..................................... 14

    B.   Plaintiff Cannot Satisfy the Requirements of Rule 23(a) .................................... 15

        1.   Plaintiff Has Not Shown Commonality .................................................. 15

        2.   Plaintiff Has Not Demonstrated Typicality ............................................ 15

        3.   Plaintiff Cannot Demonstrate Adequacy ................................................ 16

    C.   Plaintiff Cannot Satisfy the Elements of Rule 23(b)(3) ...................................... 19

        1.   Individual Issues Predominate Over Common Issues .............................. 19

            a.   An Individualized Inquiry is Required to Determine
               Liability ......................................................................................... 19

            b.   An Individualized Inquiry is Required to Prove Any
               Damages ........................................................................................ 21

        2.   The Class Action Mechanism Is Not Superior ........................................ 21

OHS West:260691440.4

- i -

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS
CERTIFICATION  [C 06 6773 WHA]

**TABLE OF CONTENTS**
**(continued)**

Page

D.    Plaintiff Has No Class Action Trial Plan ................................................................ 24

IV.    CONCLUSION ................................................................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Page**

3

## FEDERAL CASES

4

*Arnett* v. *Amer. Nat'l Red Cross*,
   78 F.R.D. 73 (D.D.C. 1978)..................................................................................... 17

*Bishop* v. *Petro-Chemical Transp., LLC*,
   582 F. Supp. 2d 1290 (E.D. Cal. 2008)................................................................... 15

*Blackwell* v. *Skywest Airlines*,
   245 F.R.D. 453 (S.D. Cal. 2007).............................................................................. 15

*Bodner* v *Oreck Direct, LLC*,
   2007 U.S. Dist. LEXIS 30408 (N.D. Cal. 2007)............................................... 18, 19

*Brown* v. *Fed. Express Corp.*,
   249 F.R.D. 580 (C.D. Cal. 2008) ....................................................................... 15, 22

*Cornn* v. *UPS*,
   2005 U.S. Dist. LEXIS 30419 (N.D. Cal. 2005)..................................................... 15

*Deitz* v. *Comcast Corp.*,
   2007 U.S. Dist. LEXIS 53188 (N.D. Cal. 2007)..................................................... 17

*Dukes* v. *Wal-Mart, Inc.*,
   509 F.3d 1168 (9th Cir. 2007).................................................................................. 14

*Fiandaca* v. *Cunningham*,
   827 F.2d 825 (1st Cir. 1987) ............................................................................... 17, 18

*Garcia* v. *Sun Pac. Farming Co-op.*,
   2008 WL. 2073979 (E.D. Cal. 2008)....................................................................... 15

*Goldberg* v. *Kelly*,
   397 U.S. 254 (1970)................................................................................................. 25

*Graves* v. *Colorado*,
   31 Fed. R. Serv. 2d 1480 (D. Colo. 1980) .............................................................. 18

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008)..................................................................................... 14

*In Re Indust. Diamonds Antitrust Litig.*,
   167 F.R.D. 374 (S.D.N.Y 1996) .............................................................................. 20

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
   219 F.R.D. 661 (D. Kan. 2004)................................................................................ 16

*In re Wal-Mart Wage & Hour Empl. Practices Litig.*,
   2008 U.S. Dist. LEXIS 50928 (D. Nev. 2008) ....................................................... 15

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3  *In re Wells Fargo Home Mortg.*,
        571 F.3d 953 (9th Cir. 2009)............................................................. 14, 15
4
    *J.B.* v. *Valdez*,
5        186 F.3d 1280 (10th Cir. 1999)................................................................ 14

6  *Jimenez* v. *Domino's Pizza*,
        238 F.R.D. 241 (C.D. Cal. 2006) ............................................................. 15
7
    *Kay* v. *Wells Fargo*,
8        247 F.R.D. 572 (N.D. Cal. 2007) ............................................................ 15

9  *Kenny* v. *Supercuts, Inc.*,
        252 F.R.D. 641 (N.D. Cal. 2008) ........................................... 14, 15, 19, 21
10
    *Kimoto* v. *McDonald's Corp.*,
11       2008 U.S. Dist. LEXIS 86203 (C.D. Cal. 2008) .................................... 15

12  *Kohler* v. *Hyatt Corp.*,
        2008 U.S. Dist. LEXIS 63392 (C.D. Cal. 2008) .................................... 15
13
    *Lanzarone* v. *Guardsmark Holdings, Inc.*,
14       2006 U.S. Dist. LEXIS 95785 (C.D. Cal. 2006)............................... 14, 15

15  *Lerwill* v. *Inflight Motion Pictures, Inc.*,
        582 F.2d 507 (9th Cir. 1978)................................................................... 18
16
    *Lewallen* v. *Medtronic USA, Inc.*,
17       2002 WL 31300899 (N.D. Cal. 2002).................................................... 15

18  *Maddock* v. *KB Homes, Inc.*,
        248 F.R.D. 229 (C.D. Cal. 2007) ............................................................ 15
19
    *Matthews* v. *Book-of-the-Month Club*,
20       62 F.R.D. 479 (N.D. Cal. 1974)............................................................. 24

21  *Mazur* v. *eBay, Inc.*,
        257 F.R.D. 563 (N.D. Cal. 2009)............................................................ 21
22
    *McLaughlin* v. *Am. Tobacco Co.*,
23       522 F.3d 215 (2nd Cir. 2008)................................................................. 21

24  *Newton* v. *Merrill Lynch*,
        259 F.3d 154 (3rd Cir. 2001) ................................................................. 21
25
    *Perry* v. *U.S. Bank*,
26       2001 U.S. Dist. LEXIS 25050 (N.D. Cal. 2001)................................... 15

27  *Robinson* v. *Texas Auto. Dealers Ass'n*,
        387 F.3d 416 (5th Cir. 2004)................................................................... 25
28

**TABLE OF AUTHORITIES**
(continued)

Page

*Salazar* v. *Avis Budget Group, Inc.*,
  251 F.R.D. 529 (S.D. Cal. 2008)...........................................................................15

*Sepulveda* v. *Wal-Mart Stores, Inc.*,
  237 F.R.D. 229 (C.D. Cal. 2006) ...........................................................................15

*Smith* v. *T-Mobile, (C. D. Cal.)*,
  2007 WL. 2385131 (C.D. Cal. 2007)......................................................................15

*Szabo* v. *Bridgeport Machs., Inc.*,
  249 F.3d 672 (7th Cir. 2001)..................................................................................15

*Valentino* v. *Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996)...........................................................................22, 25

*Vinole* v. *Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009)...........................................................................14, 15

*Vuyanich & King* v. *Republic Nat'l Bank of Dallas*,
  82 F.R.D. 420 (N.D. Tex. 1979) .............................................................................17

*Wagner* v. *Taylor*,
  836 F.2d 578 (D.C. Cir. 1987) ...............................................................................17

*Western Elec. Co., Inc.* v. *Stern*,
  544 F.2d 1196 (3d. Cir. 1976).................................................................................25

*Wren* v. *RGIS Inv. Specialists*,
  256 F.R.D. 180 (N.D. Cal. 2009)......................................................................14, 15

*Zinser* v. *Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001)..................................................14, 15, 19, 22, 25

**STATE CASES**

*Alix* v. *Wal-Mart Stores, Inc.*,
  868 N.Y.S.2d 371 (2008) ........................................................................................24

*Meachum* v. *Outdoor World Corp.*,
  654 N.Y.S.2d 240 (1996) ........................................................................................18

**FEDERAL STATUTES**

Fed. R. Civ. P. 23 .....................................................................................14, 15, 16, 19

## I.     **INTRODUCTION**

Plaintiff's certification motion is supported by defective declarations of four ex-employees who worked a combined total of 10 months many years ago,[1] along with a handful of long outdated policies (not seen by any declarant), which she twists to fit her theory.[2]   Plaintiff studiously ignores the fact that ***none*** of the 14 versions of the dress code policy ever required Gap clothing to be worn, and ***all of them*** permit employees to wear brands other than Gap.   Unable to rely upon the lawful policies, Plaintiff resorts to an alleged contradicting oral "policy" supposedly explained to her in a single conversation by a single manager in 2002.   Plaintiff's tortured interpretation is rebutted by nearly 200 current and former Gap employees in declarations explaining how the dress code was actually implemented and interpreted—again, lawfully.

Plaintiff offers no appropriate basis for certification of a class of more than 40,000 Gap employees who worked in New York over the past nine years.   First, Gap's written policies are clearly lawful and rebut Plaintiff's claims.   Second, in the absence of any policy requiring Gap clothing purchases, assessment of whether individual managers gave conflicting oral instructions interpreted as compelling purchases requires a highly individualized inquiry.   Third, the scant evidence supporting Plaintiff's claims, and the mountain refuting them, confirms the inadequacy of Plaintiff and her lawyers, and the lack of superiority of the class process here.   This is

---

[1] Declarant Maldonado misspelled both her first and last name, made only one purchase, abandoned her job after working only 3 shifts (in 2003, not in 2006 as she claims). Declarant Gaffey applied for work because she "loved" Gap clothing, made several purchases (almost all of which were sale items), then abandoned her job after working 7 shifts in 2002 (not 2003 as she claims). Declarant German worked for seven months, not the 10 she claims, didn't make a single purchase, and abandoned her job after receiving a warning.  *See* Declarations of Catherine Geerhart and Lora Peralta in the Compendium of Evidence filed herewith.  These declarations were the only ones submitted by Plaintiff from contact information provided for 3,700 employees.  Declaration of Jessica Perry in support of Gap's Opposition to Motion for Class Certification and Motion to Strike and Objections to Evidence ("Perry"), ¶34.  These witnesses were not disclosed in Plaintiff's initial disclosures, or any supplemental disclosures at any time prior to Plaintiff's filing, and should therefore be stricken.  *See* Motion to Strike and Objections to Evidence filed herewith.  Of course, it would be improper for Plaintiff to attempt to submit additional declarations on Reply.

[2] Indeed, all language in the documents on which Plaintiff seeks to rely has not appeared in any Gap policy or communication since 2003.  Moreover, some of the documents were never used or distributed in the state of New York and thus could not possibly have been seen by the putative class. *See* FN. 8 *infra.*

1

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF OPPOSITION TO  MOTION FOR CLASS
CERTIFICATION  [C 06 6773 WHA]

especially true because this lawsuit is entirely lawyer induced; Plaintiff asserted claims only because she (like another named plaintiff her lawyer represented in a similar lawsuit), responded to counsel's advertisement shopping for plaintiffs.[3]   Finally, because the evidence confirms that many employees choose to work at Gap primarily for the generous employee discount, and purchased merchandise for their personal use and gifts for others, it would be impossible to determine what portion, if any, of an employee's purchases were allegedly coerced.  Plaintiff simply has not met her burden and certification should be denied.

## II.    FACTUAL BACKGROUND

### A.    Gap's New York Operations

Gap is known all over the world for its classically styled, high quality, casual apparel and accessories for men, women and children at moderate price points. SE1[4]  Gap offers wardrobe basics such as denim jeans, skirts and jackets; khaki pants; knit polo shirts; woven button-down shirts; and t-shirts.  SE2  These items are available in basic colors (*i.e.,* white, black, grey and navy) year-round and seasonal colors.  SE3  Gap, like other retailers, follows fashion trends.  SE4

Over the past nine years, Gap has operated different types of stores, including Adult, GapKids, BabyGap, and GapBody stores. SE5[5]  Some stores have multiple levels and are so large they operate as their own district; others are small with a small staff. SE6[6]  In general, stores have

---

[3] In fact, counsel have built a cottage industry asserting similar claims against several other retailers, including in matters in which they obtained other clients through advertisements (and in which their fees nearly equaled class payouts). *See* Declaration of Lynne C. Hermle in Support of Gap's Opposition to Motion for Class Certification and Motion to Strike and Objections to Evidence ("Hermle"), ¶16, 17, Ex. 5. Plaintiff also admitted that, contrary to her lawyer's representations throughout this litigation (*Id.*, Ex. 7, p.16), she resigned her Gap employment not for any reasons related to the policy at issue, but because she did not like her commute and thought employees were "fake" (similar to the reasons she left two other jobs).  Perry Ex. 2 (Plaintiff's Depo. 33:9-18; 34:12-22).

[4] Citations for the supporting evidence is contained in the Summary of Evidence ("SE"), attached as Exhibit 1 to the Perry Declaration.  Except for the Hermle and Perry declarations, the declarations referenced herein are in alphabetical order in the Compendium of Evidence.

[5] Some stores are in distinct physical locations from any other store; others house Adult, Kids, Baby and Body as separate departments within the same physical location. Low ¶6.

[6] The number of employees ranges from 20 to over 300 in a store depending on store size, volume, complexity, layout, hours and time of year. Low ¶9.

1   a General Manager ("GM") who, depending on the store's size, volume and complexity, is

2   assisted by a Store Manager and assistant managers, only assistant manager(s), or only shift

3   supervisors called keyholders. SE7  Employees generally work varying shifts with different

4   managers. SE8[7]

5          In New York, the GMs report to District Managers, who generally oversee seven to

6   nineteen stores.  The District Managers report to Regional Managers, who oversee seven to nine

7   districts, and who report to a Zone Vice President, who oversees approximately 365 stores in the

8   Eastern United States, including the 75 stores in New York. SE9  During the past nine years, the

9   structure in New York has changed; new districts have been created, consolidated and eliminated,

10  and significant turnover has occurred in the management team. SE10  Gap has employed over

11  40,000 sales associates in New York stores during the nine year putative class period. SE11

12         **B.      Gap's 14 Versions of the Dress Code Policy**

13         Gap expects that its employees look neat, clean and professional. SE12  While Gap has

14  had <u>14 different iterations of its dress code over the past nine years, it has ***never*** required its

15  employees to wear Gap clothing</u>. SE13[8]

16         Some of the Gap policies applicable in 2000 and 2001 stated that employees should "wear

17  clothing that is reflective of the Gap brand style." SE14  This meant that employees should wear

18  casual clothing that reflected Gap's clean and casual image epitomized in denim, khakis, woven

19  shirts, and polos and t-shirts. SE15  It has always been acceptable for employees to wear clothing

20  _____

21  **7** For example, an associate may be scheduled to work from 12-4 pm on Monday, 5-10 pm on
    Thursday and 10am-6pm on Saturday, and may work with different managers during each of

22  those shifts. The following week, the associate may work entirely different shifts with different
    managers during each shift. Low ¶9.

23  **8** On one occasion, some stores utilized a special dress code. During the 2002 holiday season,

24  there were 12 days known as the "12 days of holiday" when employees were required to wear a
    red or white top and denim bottoms to work. Gap did not specify that the employee had to wear a

25  red or white Gap top or Gap denim, nor did Gap specify the type of top or denim an employee
    should wear. Indeed, employees were free to wear any red and white top of their choosing with

26  any piece of denim. There may have been a store or district in Bergen County, New Jersey, that
    created its own "12 days of holiday" dress code which required employees to wear Gap denim

27  during the period. This specific dress code was not applicable in New York, and there is no
    evidence that Gap did not provide the denim bottoms for the employees in that New Jersey store

28  as part of the dress code. Low ¶18; Sadaka ¶13; Perry Ex. 3 (Low Depo. 111:22-114:17).

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS
CERTIFICATION  [C 06 6773 WHA]

1    from any retailer, as long as it reflects the brand, meaning it looks like something Gap would sell

2    (such as a polo shirt or khaki pants) and does not have visible logos or distinctive identifying

3    marks. SE16  In fact, the policy listed examples of items which could be purchased at other

4    retailers.  Even items with distinctive logos are fine to wear as long as the logos are covered with

5    a long shirt, sweater or belt. SE17  Given that retailers from Ralph Lauren to Wal-Mart sell polo

6    shirts, khaki pants and denim, acceptable clothing can be found at every price point. SE18

7    Additionally, because Gap clothing generally does not display logos on its clothing, it can be

8    impossible to tell when someone is wearing a Gap polo shirt as opposed to one from another

9    retailer without inspecting the label. SE19

10         The early versions of the dress code policy "encouraged" employees to wear "franchise

11   merchandise that the Gap is famous for, such as jeans and khakis and activewear," although they

12   did not require the purchase of Gap merchandise. SE20  This was meant to encourage the wearing

13   of styles that made Gap famous, not the wearing of only Gap clothing. SE21  The policy also

14   encouraged employees to "wear merchandise that is currently sold in your store" and informed

15   them that they could use their discount to wear in-style clothing. SE22[9]  Because most retailers

16   follow the same trends, the employee could purchase items at many other competitors. SE23[10]

17   However, Gap carries jeans, khakis, polos and t-shirts year-round, and thus, many styles could be

18   worn, regardless of whether purchased at Gap. SE24[11]  The policy also encouraged wearing

19   clothing that was "reflective of the current season," meaning shorts in the summer and

20   turtlenecks in winter. SE25

21         In February 2001, the policy was revised to state that employees were "encouraged to

22

23   _____

24   [9] If an employee did not have basic clothing to wear to work and wanted to purchase it from Gap,
     Gap offered a discount to the employees so that they could purchase those basic items that were
25   always appropriate to wear to work.  *See* Section F *infra*.

26   [10] For example, if the store was selling fashion items, such as a ruffled tank top, the employees
     should wear that style rather than wearing last season's trend of tank tops with rhinestones. Low
     ¶22.  Basic styles continued to be appropriate.
27   [11] According to Plaintiff, some misinterpreted the policy and construed the phrases related to
     "current" merchandise to mean to encourage employees to wear the exact Gap merchandise
28   currently on sale in the store.  *See* p.12 *infra*.

wear Gap or Gap-like merchandise." SE26[12]  This conveyed that employees could wear any

retailer's polo shirt, turtleneck, sweater, or other items similar to clothing Gap sells. SE27

In November 2002, Gap felt that customers could not distinguish employees from

customers, who were not being assisted properly, and that its image was suffering. SE28  The

policy was revised to implement more professional standards. SE29  It prohibited tube tops,

sleeveless shirts and tank tops, shorts, athletic sneakers and flip flops, athletic wear, hats, and

required that shirts have a collar and skirts not be shorter than mid-thigh. It also required that

clothing be clean, pressed and in good condition. SE30  This annoyed employees accustomed to

wearing t-shirts and shorts, who also could no longer wear merchandise Gap was currently

selling. SE31  Nothing in this revision stated that employees had to wear Gap clothing. SE32

In February 2003, the policy was revised to require shirts to be tucked in and belts. SE33

This created even more controversy among employees who felt that this affected their ability to

look stylish. SE34[13]  Again, nothing in this version required wearing Gap clothing. SE35

---

[12] ***Plaintiff fails to address this or any of the subsequent policies in her motion.***

[13] These policy revisions prompted a lawsuit in California. In that suit, plaintiff alleged Gap
violated California law by requiring employees to wear particular colors and distinctive styles
of clothing, which plaintiff alleged were akin to a uniform under specific provisions of the
California Labor Code.  Hermle ¶4. That lawsuit was settled, without any admission of
wrongdoing by Gap, in 2003. *Id.* ¶11. Numerous employees who received notice of the lawsuit
wrote in to protest that the claims were meritless and many opted out. *Id.* ¶¶12, 13, Exs. 1, 2. In
fact, there was an outcry from the settlement class which ridiculed the allegations, and many
people, including ex-employees, wrote to describe the claims as frivolous.  One wrote a letter
criticizing plaintiff's counsel and included a copy of a cartoon.  The letter stated:
"For nearly four years, I worked at GAP South Coast Plaza, which is one of their premier
locations.  I 'floated' between Baby GAP, GAP Kids, and GAP stores and never once (even
though I was only 16-19 years old) was I pressured to wear GAP clothing or accessories.  As a
matter of fact, I dressed cutting-edge and wore tight fitting t-shirts when the routine trend at that
time was for guys to wear baggy t-shirts.  Then, *as now*, no one from GAP has ever said anything
to me that I needed to wear GAP/BR clothes or accessories.  I cannot think how the Plaintiff
arrived at his conclusion regarding alleged on-the-job clothing and accessories purchase
'requirements.'  For example, GAP's tolerance of diverse style is reflected in their national ad
campaigns.  Everyone (except for maybe, you) knows that Sarah Jessica Parker ('SJP') wears
accessories from other purveyors in GAP ads.  SJP wears shoes, jewelry, scarves, hats, etc that
are *not* GAP or Banana Republic items.  Please name one other clothing company that does this
in their ads.  Thus, to even suggest that GAP 'requires' a pre-fab company uniform purchase by
their employees is an absurd accusation.  My work clothing comes from a variety of sources such
as: Express Men, Nordstrom Rack, Bloomingdales, Sport Chalet, Mervyns, thrift stores, Old

1  Due to negative feedback about the restrictions, which barred employees from wearing

2  much of what was selling in the stores, the dress code was again revised in August 2003. SE36

3  This time, it permitted untucked shirts and all woven and certain knit tops, even those without

4  collars. SE37  It removed all "reflective of current season" language and language encouraging

5  the purchase of Gap clothing. SE38  <u>That language does not appear in any dress code policy or</u>

6  <u>communication after the August 2003 revision</u>. SE39

7  In March 2006, Gap embarked on a "You be You" campaign which encouraged

8  employees to express themselves in their personal appearance. SE40  This policy allowed t-shirts

9  (including graphic t-shirts with phrases), casual knits, hooded sweatshirts, shorts, fashion

10  sneakers and athletic sneakers (such as Nike tennis shoes). SE41  The policy explicitly reminded

11  employees they were not required to purchase or wear Gap merchandise. SE42

12  In October 2006, the policy was revised to remove any mention of the "Gap or Gap-like"

13  clothing, and that language has not been part of the dress code since that revision. SE43  Instead,

14  Gap relied on employees to use good judgment in their personal dress.  The policy continued to

15  remind employees they were not required to purchase or wear Gap merchandise. SE44  By June

16  2007, management determined again that employees needed to look more professional. SE45

17  The policy was revised to prohibit athletic wear, graphic t-shirts, shorts, leggings, and athletic

18  sneakers. SE46  It continued to remind employees they were not required to purchase or wear

19  Gap merchandise. SE47

20  In May 2009, the policy was revised to allow the "distressed denim" trend and shorts

21  during the summer. SE48  Again, it reminded employees they were not required to purchase Gap

22  merchandise. SE49  Regardless of the applicable policy, employees regularly wore non-Gap

23  clothes to work. SE50.  Employees wore clothes purchased from: Levi's, Earl Jeans, Polo Ralph

24  Lauren, H & M, Forever 21, Saks 5th Avenue, Bergdorf Goodman, Prada, Narciso Rodriguez,

25

26  Navy, The Lab, Robinson-May, and pass-a-longs from my dad and brothers."  Statements by
Plaintiff's counsel suggesting that there have been multiple Gap settlements regarding such

27  claims are not true.  *See e.g.* Hermle Ex. 7, p.16 (Plaintiff's counsel Connor to the Ninth Circuit:
"there have been <u>a number of settlements </u>with the GAP on this allegation.")(emphasis added).

28

1  XOXO, Banana Republic, Aeropostal, Old Navy, Hollister, American Eagle, J Crew, Lacoste,

2  Abercrombie & Finch, Lord and Taylor, Macy's, Express, Ann Taylor, The Limited, French

3  Connection, Zara, Club Monaco, Lane Bryant, Ashley Stuart, New York & Co., Seven Jeans,

4  Citizens of Humanity, Century 21, Bloomingdale's, Nordstrom's, Urban Outfitters, Lucky Jeans,

5  Ann Taylor Loft, True Religion Jeans, Joe's Jeans, Dockers, Liz Claiborne, Kenneth Cole, Willi

6  Smith, TJ Maxx, Lands End, Eddie Bauer, Kohl's, Anthropologie, JC Penny's, Target,

7  Motherhood, Tommy Hilfiger, DKNY, Esprit, Black & Brown, Victoria's Secret, Charlotte

8  Russe, Fashion Bug, Wal-Mart, Lilly Pulitzer, Loehmann's, Marshall's, Pretty Girl, $10 Store,

9  Neiman Marcus, Donna Karen, Uniqlo, Sean John, Fiorucci, Nautica, Ben Sherman, Calvin

10  Klein, Sperry, Penguin, Evisu, Lerner, Dr. Jays, CVS, Joyce Leslie, Pac Sun, Hot Topic, Gloria

11  Vanderbilt, Energy, Bebe, Talbots, Avenue, Michael Kors, Mossimo, Marshall's, Pod Maternity

12  Wear, Tommy Bahama and Armani Exchange. SE51  Employees also wore clothing from vintage

13  and thrift stores, as well as local boutiques. SE52

14  **C.   Training on the Dress Code Varies By Store**

15  Training and orientation are not centralized within Gap's stores organization.  Depending

16  on the store, associates can be hired, oriented, trained and supervised by a GM, Store Manager,

17  Associate Manager, Assistant Manager, and/or seasoned associate. SE53  New employees

18  typically participate in an initial orientation during which policies are explained, including the

19  Open Door Policy, Code of Business Conduct, Discount Policy and dress code. SE54   Gap's

20  training guides ask the manager to explain that "dress code guidelines are designed to ensure you

21  come to work looking neat and professional.  However, **you are not required to wear Gap**

22  **merchandise.**" SE55[14] How a particular manager—including those now included in Plaintiff's

23  class definition—chooses to conduct training and what is explained regarding the dress code

24

_____

25  **14** *See also* SE55 (S. Gutierrez Ex. A, (2009 guide, p.28); *see also* Ex. B (2003 guide, p. 36
26  ("[y]ou are not required to wear Gap, Inc. merchandise"); 2007 guide, p.31 ("'[Gap is] passionate
   that you be you. We make it easy for you to express your personal style throughout your life.'
27  The personal appearance guidelines are designed to ensure you come to work looking neat and
   professional. However, you are not required to wear Gap merchandise.'"); 2008 guide, p. 28
28  ("you are not required to wear Gap merchandise"))).

depends on the manager and questions from the new employee. SE56[15]  When policies are

updated, managers use their discretion to determine how to provide the new information, which

again depends on the particular manager and his/her communication style. SE57

### D.     Gap's Efforts to Ensure Employee Understanding of the Dress Code

#### 1.     Gap Reminded Employees Wearing Gap Was Not Required

     Gap has also issued at least seven written reminders that employees are not required to

wear Gap clothing.  For example, in connection with a November 2002 policy revision, Gap

reminded all managers "this new dress code *still permits* employees to wear Gap **or Gap-like**

clothing to work." SE58[16]  Following the filing of the California lawsuit in February 2003,[17] Gap

again emphasized that the policy "strictly prohibits" requiring purchases: "We do not require

employees to wear Gap clothing…A manager cannot require an employee to wear Gap clothing

under any circumstances." SE59  A March 2003 message from then-Vice President of Stores and

Operations Stephen Sullivan stapled to paychecks reiterated that the "dress code policy **does not**

require employees to wear Gap merchandise." SE60[18]

     In addition to written reminders, management sent similar voicemails to employees in

stores.  For example, in March 2003, Sullivan reminded employees that the "dress code policy

**does not** require employees to wear Gap merchandise." SE61[19]  Managers at all levels remind

---

[15] In addition to receiving guidance on the dress code in an orientation session or meeting, new associates are typically assigned an experienced associate as a "buddy" who can act as a resource for questions and provide guidance on the dress code. SE56.

[16] SE58 (Minnis Ex. F; *see also* Ex. E (October 2002 reminder ("Employees are *not required* to wear Gap clothing."))).

[17] *See* Hermle ¶2, 4.

[18] *See also* SE60 (Minnis Ex. G (August 2003 reminder with a policy revision: employees "are not required to wear Gap brand clothing."); Ex. H (April 2006 dress code communication reminding employees that they did not have to wear Gap clothing: "We do not require, suggest or encourage associates to wear our product or to have a particular "look", e.g., "current"); Ex. I, (Aug. 2007 reminder that "[o]ur employees are not required to purchase or wear Gap or other Gap Inc. clothing, and are free to dress in ways that reflect their own personal tastes and individual style, provided that they do not violate our Employee Appearance Policy."); Ex. J (Sept. 2009 Update to all upper management and HR employees: "Gap policy expressly prohibits leaders from encouraging or requiring employees to buy Gap Inc. merchandise to wear to work."))).

[19] *See also* SE61 (Minnis ¶13 (Oct. 2002 voicemail from Northeast Zone HR Director to all Regional Managers informing them they should discuss the dress code with their District

1   employees that they do not have to wear Gap clothing in district calls and other settings. SE62

2          In some cases, employees acknowledged their understanding of the dress code in writing.

3   SE63  Nothing in the acknowledgements required employees to wear Gap and some explicitly

4   stated that wearing Gap was not required. SE64[20]

### 2.     Gap's Dress Code Posters Specifically Include Non-Gap Clothing

6          To help employees understand to the meaning of "reflect the brand" and "dress to sell" –

7   Gap-speak for neat, clean and professional dress – Gap disseminated posters with pictures of

8   acceptable attire. SE65  The posters show a variety of acceptable items, including wardrobe

9   staples sold by Gap and other retailers, such as woven shirts, polo shirts, khakis, jeans, and

10  sweaters.  The posters display non-Gap clothing and explicitly state that employees may wear

11  other brands to work. SE66

### 3.     Gap's Various Methods to Report Dress Code Concerns

13         In accordance with its culture, Gap disseminates to all employees an Open Door Policy,

14  which encourages employees to raise concerns or complaints to their supervisors, other managers,

15  Employee Relations or Human Resources. SE67  The policy is emphasized and acknowledged in

16  training. SE68  Gap also requires employees to comply with its Code of Business Conduct, which

17  promotes an ethical work environment and prohibits employees from violating applicable law.

18  SE69  The Code explains that employees may anonymously call a free hotline staffed 24/7 to

19  report suspected violations, or are free to email Gap's compliance department. SE70

20         In February 2003, after receiving notice of the California lawsuit, Gap set up a dedicated

21  hotline for dress code concerns. SE71[21]  Of the four calls the hotline received related to New

22

---

23  Managers and General or Store Managers, and that it should be very clear that Gap does not
    require associates to wear Gap)).

24  [20] Indeed, some of them specifically reminded employees they **were not** required to wear Gap
    clothing. *See* Perry Ex. 18, *e.g.* GAP 01000 (2003 acknowledgements that employees were not

25  required to wear Gap, only clothing that was professional and expressive of Gap standards).

26  [21] As noted above, Gap had an existing hotline for employee issues (including dress code issues),
    but set up a special, dedicated hotline with one employee relations representative responding to

27  all dress code issues to ensure any employees with questions or concerns about the dress code
    could raise them. The hotline ceased receiving calls by early May 2003 (less than four months

28  after its implementation).  Minnis ¶¶ 5, 8, 9.

York dress code issues, only one, ultimately determined to be unfounded, related an allegation of pressure to wear Gap clothes. SE72[22]

### E.    The Enforcement of the Dress Code Varies by Store

Managers at individual stores are responsible for enforcing the dress code. SE73  There are wide variations in how they do so. SE74  Employees are not evaluated on appearance or whether they purchase Gap clothing. SE75  In fact, clothing purchases are not tracked, and except for loss prevention concerns, are not reviewed. SE76  Gap could not locate any written warnings related to employees not wearing Gap or Gap-like clothing, nor terminations for such reasons. SE77

### F.    Gap's Generous Employee Discount

#### 1.    The Discount Policy for Employees And Family Members

Gap has a generous discount policy which attracts many applicants.  Until early 2009, employees received 50% off some items each month, and 30% off additional purchases, sale merchandise, gift purchases, or gift cards. SE78  In 2009, Gap provided an unlimited 50% discount on full price items (including family and gift purchases) and 10% off sale items and gift cards. SE79  In addition, Gap offered deeper discounts (60-65%) in connection with new merchandise roll-outs on items anticipated to be in high demand, such as an entire outfit (pants, shirt, and belt) for $30, or for a set discounted price ($38 twill pants for $15 or a $24.50 polo shirt for $5). SE80

Employees view the discounts as a valuable benefit. SE81  In fact, it is the primary reason many apply for and continue to work at Gap. SE82  Due to generous discounts, they can purchase clothing less expensively, such as a $5 Gap polo versus something similar for $65 at Ralph Lauren. SE83  Moreover, employees wear Gap when they are not working, such as on dates, to church, a second job, school, to socialize, and other settings. SE84  Employees also use the

---

[22] Indeed, although Gap has a well-publicized employee relations department, human resources department, and confidential anonymous hotline, in nine years, there has been only a single concern raised by a New York employee who felt someone suggested she wear Gap clothing (and once investigated, it was clear that the complaint arose from a misunderstanding). All other calls related to the "neat and clean" aspects of the policy.  Minnis ¶9.

1   discount in purchases for spouses, children, other family members and friends, and gifts for

2   holidays, birthdays, baby showers, and other occasions. SE85  Some employees do not purchase

3   for personal use because Gap clothing does not fit, or the employee prefers other retailers. SE86

4           Spouses and children receive a discount too.  Before 2009, a spouse or child could

5   purchase unlimited items at a 30% discount; as of 2009, spouses receive the employee discount –

6   50% off full-price items and 10% off sale items. SE87  Family members may make purchases

7   without the employee being present, by simply presenting a card to the cashier, and the sale is

8   rung up under the employee's identification number. SE88

9                    **2.        The Tracking of Purchases Made with the Employee Discount**

10          Gap does not track employee purchase data separate from customer data. SE89  Nor does

11  Gap track family member purchases separate from employee purchases. SE90  Moreover, unless

12  it is obvious from the purchase (*i.e.* baby items), it is impossible to tell which purchases were for

13  an employee's use and which were gifts. SE91  There is nothing in the data which indicates

14  whether an employee used Gap wages for the purchase (employees are not allowed to have a

15  purchase deducted from their wages) or whether the purchase was made with some other funds,

16  such as money from another job, a spouse's wages, gift money, a tax refund, or other funds. SE92

17          **G.        Plaintiff's Employment with Gap**

18          Plaintiff was hired as a part-time associate at the McKinley Mall store in Blasdell, New

19  York on July 8, 2002 (Perry Ex. 2 (Plaintiff Depo. 39:1-22)).   The <u>one and only communication</u>

20  she had with any manager about the dress code occurred during orientation on her first day of

21  work on July 8 (79:16-80:9).[23]  During this orientation, Plaintiff received a copy of the dress code

22  (60:10-23)[24] and admits that <u>nothing in the language of the written policy requires employees to</u>

23  <u>wear Gap clothing</u> (64:4-65:21).[25]  However, she alleges that the manager said she had to wear

24  _____

25  **23** During the orientation, Plaintiff also executed paperwork agreeing to comply with Gap's
    policies, including its discount policy and its Code of Business Conduct.  Perry Exs. 25-27.
26  **24** Plaintiff does not remember the names of <u>any</u> manager at Gap (41:10-13; 41:14-16; 70:8-17).
27  **25** Though the policy stated she could wear "Gap-like" clothing, Plaintiff never asked what "Gap-
    like" meant or why her manager's alleged description of the dress code contradicted the language
28  in the policy (110:14-111:4).

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS
CERTIFICATION  [C 06 6773 WHA]

Gap clothing currently for sale in the store when working, and that it could not be on sale (53:16-56:13).**26**  Plaintiff did not ask questions about the policy or the alleged instruction, although it was contrary to the written policy in front of her (67:4-68:22).**27**  Although she already owned Gap clothing (purchased months before she began work) (36:14-25), Plaintiff <u>did not wear Gap clothing</u> during her first or second day of work (74:1-8; 94:7-18).  Plaintiff admits that no one commented on her clothing, said she was out of dress code, disciplined her for not wearing Gap or spoke to her about the need to purchase Gap clothing (72:21-25; 74:16-75:25).**28**

On July 10, <u>before she was paid any wages</u>, Plaintiff made her first employee purchase, spending $17.83 (Perry Exs. 2, 31; 92:7-12, 93:11-22).**29**  On July 17, she bought items totaling $22.09 (Perry Exs. 2, 31; 95:23-96:3). On July 25, Plaintiff worked her third shift consisting of one hour (Perry Exs. 2, 28; 76:4-11).  On July 31, Plaintiff bought items totaling $48.62 (Perry Exs. 2, 31; 96:24-97:4).  On August 1, her last day, Plaintiff worked for 4.5 hours (Perry Exs. 2, 28; 76:25-77:17).  Within a week, she quit because of commute issues and her "fake" co-workers (114:2-116:13).**30**  In total, she earned $73.95 for four shifts totaling 12.75 hours (Perry Exs. 2, 28-30; 83:24-84:9).  She contends that as a result of the alleged orientation instruction, she

---

**26** Despite this alleged instruction, Plaintiff bought several items that were on sale, and thus, according to her theory, could not have been worn to work (95:23-96:18); Peralta ¶10.

**27** Plaintiff understood that she was free to ask questions during the orientation, but asked none (45:13-16; 56:17-19). She also understood that Gap had an Open Door policy and could ask questions about her employment, but though she thought the alleged dress code was unfair, she said nothing (45:17-24; 111:10-16; 60:24-61:15).

**28** In fact, **no one ever** discussed her clothing with her, commented on her outfits, told her she was dressed inappropriately, told her she was out of dress code, or disciplined her during her brief employment (80:13-81:2).

**29** Plaintiff received her first paycheck on July 16, nearly a week later (Perry Exs. 2, 30; 84:13-85:11).

**30** Despite her lawyers' representations during the course of this case, her departure had nothing whatsoever to do with the dress code. *See, e.g.,* Hermle Ex. 7, p.4 (Plaintiff's counsel responding to questions from the Ninth Circuit regarding "Whether you're really going to be able certify a class based on this plaintiff who worked for 12 hours and who never actually, therefore, had to engage in the continuing purchase of Gap clothing": "It is our clear understanding that…our client was in part discouraged by this practice from continuing to work there.")  Indeed, after her employment with Gap ended, Plaintiff left two other jobs (one after just two weeks) because she did not like her boss (Perry Ex. 2, 33:9-18; 34:12-22).

1   bought three t-shirts, two pairs of jeans, a belt, and an item she cannot recall (95:2-97:21).[31]  She

2   spent $88.54 on her purchases, paid in cash (Perry Exs. 2, 31; 92:2-97:21).[32]  Plaintiff spent more

3   on purchases than she earned at Gap (Perry Exs. 2, 29-31; 97:16-98:2).  Obviously, like her few

4   declarants, she had no experience requiring her to purchase and wear "current" clothing on an

5   ongoing basis.  *See* Hermle Ex. 7, p.5 (Judge Berzon: "You also allege that they had to keep it

6   current, which I understand, which as I say I have a problem with your plaintiff;"  *see also* p.15:

7   "why shouldn't we say that this plaintiff isn't in any position to complain about any continuing

8   obligation to pay to buy more clothes because she didn't have to do that and indeed it isn't at all

9   clear that she needed to….She's in a very peculiar position").

10      Plaintiff didn't consider the Gap discount to be a benefit to her because she would have

11   purchased Gap clothing regardless of the discount (Perry Ex. 2, 49:11-20).  She wore her t-shirts

12   "numerous" times after her employment ended (105:6-10).[33]  She continued to purchase Gap

13   clothing (101:14-17; 105:11-22; 106:11-13; 108:11-25), purchasing more clothing in one

14   shopping trip in July 2009 than during her entire 2002 employment (Perry Exs. 2, 32; 106:25-

15   108:6).

16      Plaintiff never worked at any other Gap store (69:10-70:7); other than a brief conversation

17   with an unnamed co-worker,[34] did not have any communications about the dress code (79:7-11);

18   never spoke to any other manager about it (79:16-19); was never spoken to about her attire or

19   disciplined (76:19-24; 77:9-15); and never complained about the dress code during her

20   employment (79:12-15).  Contrary to the (foundationless) statements in her declaration, she has

21   never seen the other 13 versions of the dress code applicable during the class period (68:23-69:6);

22   has no knowledge of how any other manager implemented and enforced the dress code (112:25-

23   _____

24   [31] Plaintiff purchased clothing that she never wore to work and never attempted to return it
    (98:18-21; 102:5-7).

25   [32] Gap did not take any wages out of her paycheck for her purchases (99:15-100:4).

26   [33] Plaintiff picked clothing that was fashionable and that she could wear outside of work (100:17-
    19; 101:1-3).

27   [34] Plaintiff testified that on July 9 she asked a co-worker what the point of the dress code was and
    he responded he did not understand it either, to which she nodded her head in agreement. They
28   had no further discussions (74:16-75:25).

1   113:7); is not aware of other employees subject to the same alleged instruction (113:17-114:1);

2   does not know whether other associates wore Gap (81:7-15); never observed employees spoken to

3   or disciplined for their clothing (81:16-23); and is not aware of any dress code complaints (81:24-

4   82:1).  She knows no one else who would have information about her claims (26:23-27:1).

5   **III.   ARGUMENT**

6       **A.   The High Legal Standard Precludes Class Certification**

7       The "overarching focus" on a motion for class certification is "whether trial by class

8   representation would further the goals of efficiency and judicial economy."  *Vinole v.*

9   *Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009); *see also In re Wells Fargo*

10  *Home Mortg.*, 571 F.3d 953, 958 (9th Cir. 2009)("principal purpose" of Rule 23 is "efficiency

11  and economy of litigation").  The Court must conduct a rigorous analysis to determine whether

12  plaintiff has met her burden to establish the Rule 23 requirements.  *Zinser v. Accufix Research*

13  *Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *as amended*, 273 F.3d 1266 (9th Cir. 2001);

14  *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 643 (N.D. Cal. 2008); *In re Hydrogen Peroxide*

15  *Antitrust Litig.,* 552 F.3d 305, 320 (3d Cir. 2008)(requiring "rigorous assessment of the available

16  evidence and the method or methods by which plaintiffs propose to use the evidence" before

17  certification).  The court "need not blindly rely on conclusory allegations which parrot Rule 23

18  requirements [and] may . . . consider the legal and factual issues presented by plaintiff's

19  complaints."  *J.B. v. Valdez,* 186 F.3d 1280, 1290 (10th Cir. 1999). Moreover, "courts are not

20  only at liberty to, but *must* consider evidence which goes to the requirements of Rule 23 [at the

21  certification stage] even [if] the evidence may also relate to the underlying merits of the case."

22  *Dukes v. Wal-Mart, Inc.,* 509 F.3d 1168, 1178 n.2 (9th Cir. 2007).

23      Where, as here, Plaintiff cannot establish the existence of a company-wide policy that

24  violates the law, certification is inappropriate.  *Lanzarone v. Guardsmark Holdings, Inc.*, 2006

25  U.S. Dist. LEXIS 95785, *12-13 (C.D. Cal. Sept. 7, 2006)(denying certification: "the direct

26  evidence and declarations submitted compel the conclusion that Guardsmark has no policy that

27  violates the law," and therefore "the bulk of the issues…are inherently individualized"); *Wren v.*

28  *RGIS Inv. Specialists,* 256 F.R.D. 180, 208 (N.D. Cal. 2009)(where no explicit policy, in light of

14

the individualized inquiries necessary to evaluate employer's practices, cannot satisfy Rule 23(b)(3)"); *Garcia v. Sun Pac. Farming Co-op.,* 2008 WL 2073979, *10 (E.D. Cal. May 14, 2008)(lawful company-wide policy cannot form the basis for certification); *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 247 (C.D. Cal. 2006)(denying certification where policy was all assistant managers exempt, but duties of each manager necessitated individualized inquiry).[35]

### B.   Plaintiff Cannot Satisfy the Requirements of Rule 23(a)

To obtain certification, a plaintiff must show: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.  Fed. R. Civ. P. 23(a). Once these requirements are met, a plaintiff must also show that the action meets one Rule 23(b) criteria.  *Zinser,* 253 F.3d at 1186.

#### 1.   Plaintiff Has Not Shown Commonality

As discussed in C.1 *infra*, Plaintiff cannot establish questions of law or fact common to the class, or that such common issues predominate.

#### 2.   Plaintiff Has Not Demonstrated Typicality

Rule 23(a)(3) requires that Plaintiff establish that her claims are typical of the class.  "A plaintiff's claims are typical if they 'are reasonably co-extensive with those of absent class members.'"  *Kay v. Wells Fargo*, 247 F.R.D 572, 578 (N.D. Cal 2007); *Szabo v. Bridgeport*

---

[35] Acknowledging that there are no certified cases on her theories, Plaintiff includes in her brief a list of various unrelated employment cases that have been certified in this district. There are an equal number of cases that have not been certified, and whether other cases were certified on theories different that those advanced here is irrelevant.  *See e.g. In re Wells Fargo Home Mortg.*, 571 F.3d 953 (reversing district court's order certifying wage and hour class); *Vinole,* 571 F.3d 935 (affirming certification denial in wage and hour case)*; Perry v. U.S. Bank*, 2001 U.S. Dist. LEXIS 25050 (N.D. Cal. 2001)(denying certification in wage and hour class action); *Kenny*, 252 F.R.D. 641 (same); *Cornn v. UPS*, 2005 U.S. Dist. LEXIS 30419 (N.D. Cal. 2005)(same); *Kimoto v. McDonald's Corp.*, 2008 U.S. Dist. LEXIS 86203 (C.D. Cal. 2008)(same); *Kohler v. Hyatt Corp.*, 2008 U.S. Dist. LEXIS 63392 (C.D. Cal. 2008)(same); *Lanzarone*, 2006 U.S. Dist. LEXIS 95785 (same); *Bishop v. Petro-Chemical Transp., LLC*, 582 F. Supp. 2d 1290 (E.D. Cal. 2008) (same); *Salazar v. Avis Budget Group, Inc.*, 251 F.R.D. 529 (S.D. Cal. 2008)(same); *Garcia,* 2008 WL 2073979 (same); *Sepulveda*, 237 F.R.D. 229 (C.D. Cal. 2006)(same); *Brown v. Fed. Express Corp.*, 249 F.R.D. 580 (C.D. Cal. 2008)(same); *Blackwell v. Skywest Airlines*, 245 F.R.D. 453 (S.D. Cal. 2007)(same); *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229 (C.D. Cal. 2007) (same); *Jimenez v. Domino's Pizza*, 238 F.R.D. 241 (C.D. Cal. 2006)(same); *Smith v. T-Mobile*, (C. D. Cal.) 2007 WL 2385131 (C.D. Cal. 2007); *Lewallen v. Medtronic USA, Inc.*, 2002 WL 31300899 (N.D. Cal. 2002)(same); *In re Wal-Mart Wage & Hour Empl. Practices Litig.*, 2008 U.S. Dist. LEXIS 50928 (D. Nev. 2008)(same); *Wren,* 256 F.R.D. 180 (denying in part).

*Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)(vacating certification; highly unlikely dealers in different areas said the same things to hundreds of different buyers, a key liability issue).

Given that her claims rests upon one oral instruction by one manager of *thousands* who would have given dress code directions,[36] and she was subject to just one of Gap's 14 different policies applicable at different times during the putative class period, Plaintiff cannot establish that her experience in 12 hours of employment is typical of those of more than 40,000 employees during the last nine years at 75 other New York stores.  Moreover, Plaintiff did not wear Gap clothing on two of her four shifts; made just three purchases; never wore some of those items to work; never attempted to return them; and wore them long after her employment ended.  She has no knowledge of how other managers interpreted the policy, what others were told, whether they wore Gap clothes, or whether *anyone* was forced to make purchases.  Given the short length of her employment, she cannot be typical of employees allegedly subject to continuing purchase obligations.  The Ninth Circuit clearly recognized the significance of these typicality defects.[37]

### 3.    Plaintiff Cannot Demonstrate Adequacy

Rule 23(a)(4) requires that (1) representatives and counsel be free from irreconcilable conflicts of interest with absent class members, and (2) both have the ability to prosecute the action competently and vigorously.  "This inquiry into the knowledge of the representative is to ensure that the party is not simply lending his name to a suit controlled entirely by the class

---

[36] Low ¶7 (currently over 500 managers in New York; estimates over 2,500 during past nine years).

[37] *See* Hermle, Ex 7, p.4 (Transcript of Ninth Circuit Oral Argument: "To be frank, the other problem I have with your case in the long run is your plaintiff. Whether you're really going to be able certify a class based on this plaintiff who worked for 12 hours and who never actually, therefore, had to engage in the continuing purchase of Gap clothing that you allege occurred and it seems to me you're going to have a lot of problem proving that that even is a condition because she really wasn't subject to it and so on"; *Id.* at p. 15: "I'd like to repeat that I have the biggest problem with the state of the complaint given the circumstances of the plaintiff. Now why shouldn't we say that this plaintiff isn't in any position to complain about any continuing obligation to pay to buy more clothes because she didn't have to do that and indeed it isn't at all clear that she needed to, that she ever had an opportunity to wear any of the clothes that she actually bought.  She could have returned them. She's in a very peculiar position"; *Id.* at p. 16: "What I'm really concerned about is we're going to go through a complicated statutory analysis perhaps even including referring it to the New York courts and we're going to find out that there's no 'there' there in the end after discovery."; *Id.* " I think you could have come up with a better plaintiff. If there's really a problem out there, you'd think there would be people trying to get into this case and make allegations that are more substantial.")

1    attorney." *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 671 (D. Kan.

2    2004), *citing* 7A Wright et al., Federal Practice & Procedure § 1766, at 302-11 (2d ed. 1986 Supp.

3    2003).  Adequacy may also be defeated when litigation "could be overwhelmed by disposition of

4    unique defenses." *Deitz v. Comcast Corp.*, 2007 U.S. Dist. LEXIS 53188, *16 (N.D. Cal. July

5    11, 2007) *citing Gartin v. S&M Nutec LLC*, 245 F.R.D. 429, 434 (C.D. Cal. 2007).

6         Plaintiff cannot establish adequacy.  Her class definition ("all non-exempt employees")

7    includes managers who allegedly gave wrongful instructions.  *See* Pltf's Mem. 10:7-10

8    ("Howard...was instructed…at the time of hire that she was required to purchase and wear Gap");

9    10:10-13 ("Gaffey...was informed by a store manager that the employees were required to

10   purchase and wear Gap"); 10:14-18 ("Maldonado…also was informed during the interview

11   process...they were required to purchase and wear Gap").**38**  Plaintiff and her counsel seek to

12   represent both non-exempt managers who allegedly gave the instructions and employees who

13   allegedly relied on them—a clear conflict of interest.  As class members, it is in the managers'

14   interest to testify that such instructions were given and authorized, to increase their own potential

15   recoveries.  *See, e.g., Arnett v. Amer. Nat'l Red Cross*, 78 F.R.D. 73, 76 (D.D.C. 1978)("He has

16   been a part of the practices he is now challenging…he has an interest antagonistic to that of the

17   non-supervisory personnel"); *Wagner v. Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987)(no

18   certification: "Wagner has accused his own supervisor, who is a potential class member, of racial

19   discrimination against Wagner himself").  However, such instructions violate Gap policies,

20   constitute grounds for termination, and provide support for an unclean hands defense.  *See* Gap's

21   Answer to the Second Amended Complaint, Docket No. 27, filed June 29, 2009 (sixth defense).

22        Additionally, because counsel seek to represent and accuse class members simultaneously,

23   they cannot effectively represent the class.  *See, e.g., Fiandaca v. Cunningham*, 827 F.2d 825,

24   829 (1st Cir. 1987)(counsel who represented conflicting classes disqualified: "divided loyalties");

25

26   _____

**38** The problem is especially acute because the witnesses have not named (and apparently, cannot

27   name) the manager who supposedly gave the offending instruction. Thus, they cannot deny that
     the alleged wrongdoer was a manager who is a putative class member. *See also* Motion to Strike

28   and Objections to Evidence filed herewith.

1   *see also Vuyanich & King v. Republic Nat'l Bank of Dallas*, 82 F.R.D. 420, 434 (N.D. Tex.

2   1979)("lack of congruence among the interests of the class representatives and the class members

3   may render the attorney, despite his diligence, unable to counsel the class members and the

4   plaintiffs fully and fairly").  Indeed, it is fundamentally unfair to allow counsel to seek to profit

5   from alleged wrongs committed by the class, particularly given Gap's extensive efforts to educate

6   employees as to the proper policies.  *See e.g., Fiandaca*, 827 F. 2d at 829; *Lerwill v. Inflight*

7   *Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir. 1978)(representatives in wage case must not

8   have interests conflicting with interests of class members); *Graves v. Colorado*, 31 Fed. R. Serv.

9   2d 1480 (D. Colo. 1980)(African-American supervisor who made employment decisions

10  regarding African-American subordinates not adequate representative).

11          Plaintiff also cannot demonstrate adequacy because she asserted claims only after reading

12  an advertisement posted by her lawyers, who have shopped for named plaintiffs in identical suits.

13  *See* Hermle ¶15 (describing similar dress code claims asserted elsewhere by Plaintiff's counsel

14  herein:  "her paralegal sister saw an ad in a newspaper looking for Abercrombie & Fitch

15  employees to join a lawsuit accusing the chain of requiring staff to spend their paychecks on the

16  latest fashions"); *Bodner v Oreck Direct, LLC,* 2007 U.S. Dist LEXIS 30408, *5-6 (N.D. Cal.

17  2007)(rejecting certification:  "plaintiff's counsel, and not plaintiff, is the driving force behind

18  this action. Such a 'cart before the horse' approach to litigation is not the proper mechanism for

19  the vindication of legal rights"), *citing Meachum v. Outdoor World Corp.*, 654 N.Y.S.2d 240, 369

20  (1996)("Solicitation of clients for the commencement or continuation of a class action is

21  improper, sufficient to warrant denial of…certification");[39] *see also* Hermle ¶19 (statements by

22  Plaintiff's counsel mischaracterizing the claims asserted herein).  As Judge Patel noted in denying

23

24  [39] Indeed, Plaintiff's counsel has made similar claims at least nine different times, sometimes
    repeatedly against the same retail companies in multiple jurisdictions.  In this case, Plaintiff
25  responded to a flier posted in a Buffalo café in 2002 (15:3-20:2). She was not then looking for a
    lawyer and had no contact with any Gap employees about her claims (15:13-15; 16:18-21). When
26  she contacted Carlson & Lynch, she was not seeking legal advice and only believed that Gap
    owed her money after she spoke to the lawyers (19:13-20:2).  This is a far cry from Plaintiff's
27  counsel's representation to the Ninth Circuit that "people were so upset about what they're being
    told they have to do, have to come to us."  Hermle Ex. 7, p.16.
28

certification in the *Bodner* case for similar reasons, "the conduct in this action does not look

good, does not sound good, and does not smell good." *Bodner,* U.S. Dist LEXIS 30408 at *7.[40]

Here, the conflicts discussed above, Plaintiff's vague recollection of the alleged

instruction, her lack of knowledge of key issues (*see* pp.11-14), and the fact that "plaintiff's

counsel constructed this lawsuit before it had a plaintiff," *Bodner*, 2007 U.S. Dist LEXIS 30408

at *6, confirms the lack of adequacy.

### C.    Plaintiff Cannot Satisfy the Elements of Rule 23(b)(3)

Rule 23(b)(3) permits certification only when common questions of law or fact

predominate, and a class action is superior to other methods for fairly and efficiently adjudicating

the controversy.  The inquiry must include"the likely difficulties in managing a class action."  *Id.*

### 1.    Individual Issues Predominate Over Common Issues

#### a.    An Individualized Inquiry is Required to Determine Liability

Individual issues predominate when the substantive issues raised by Plaintiff require

individualized proof.  *Zinser*, 253 F.3d at 1189; *Kenny*, 252 F.R.D. at 642, 646 (denying

certification; policy was legally compliant 'on paper,' but complaint alleged managers engaged in

policy violations).  Here, **none** of the 14 versions of the policy require employees to purchase and

wear Gap clothing with wages.[41]  Nor can the case be certified on the basis of slogans such as

"exemplify the brand" and "dress to sell."  Nothing in their plain language compels the purchase

of Gap clothing, and there is no evidence (even from Plaintiff or her declarants)[42] that any

employee so construed them.  Moreover, the evidence confirms that application of the dress code

---

[40] In addition to these adequacy problems, the declaration provided by plaintiff's counsel Gary Lynch confirms that he does not know either the name of this lawsuit, its claims, or the legal theories asserted herein  For some unknown reason he appears to believe that this lawsuit is entitled "In Re Gap Minimum Wage Litigation," and that it asserts **minimum wage** claims.  *See* Hermle ¶19.

[41] Contrary to Plaintiff's assertion, the Ninth Circuit did not find Plaintiff's claims had any merit, but merely concluded, while questioning Plaintiff's adequacy as a representative, that it was possible she could develop facts in discovery that could possibly state a claim under the New York statutes. It is clear from Plaintiff's testimony and her paltry evidence that she cannot.

[42] None of the declarants identify any policy, written communication or dress code poster upon which they relied or construed to require them to purchase and wear Gap clothing.

varies depending on individualized factors, including a manager's understanding of the policy.[43] Employees at *every* New York store, ***including the one in which plaintiff worked***,[44] confirm that managers never enforced the dress code to require the purchase and wear of Gap attire.

There must therefore be an inquiry into each employee's understanding of what was required, whether it came from an authorized instruction, was reasonable, and how he or she relied upon it.  For example, did the instruction come from a manager or a co-worker?  Was it reasonable for the employee to interpret the alleged instruction as he/she did?  Did the instructing employee have authority to bind Gap, particularly given Gap's written clarifications?  If an employee claims to have been "encouraged" to buy Gap clothing (Pltf's Mem, p.7), how was she so encouraged?  What specifically was she told and why did she construe it as "encouragement?"  If an employee claims a manager "preferred" Gap clothing, is that sufficient under the New York statute?  Did an employee actually rely on an instruction and purchase clothing he/she would not have otherwise purchased?  Did the employee wear the item only to work, or also outside of work and derive a benefit from it?  Did the employee wear the item long after his/her employment ended?  If so, how much is Gap entitled to set off for the value of the item, which could have been sold at a higher price to the general public?  Did an employee puchase with Gap wages or other monies (as Plaintiff did)?  The required inquiry will be enormously fact specific and will splinter into thousands of mini-trials, eliminating any possibility that common issues predominate.  *In Re Indust. Diamonds Antitrust Litig.,* 167 F.R.D. 374, 382 (S.D.N.Y 1996)(key issue "is whether the proof necessary to demonstrate impact as to each class member is particular to that class member, in which case individual questions concerning impact would overwhelm the common questions").

---

[43] For example, the Bridgehampton store allows employees to wear flip-flops to work given the beach environment and customer base, whereas employees in the 59th and Lexington Avenue store wear slacks and shirts. Thus there are substantial differences in what employees could wear to work, but it has nothing to do with wearing Gap clothing. Nuzzo ¶10 (more relaxed at Bridgehampton because beach community) *cf* Cheng ¶6 (especially important to be neat, clean and professional at 59th and Lexington because professional neighborhood, wears dress shirts, slacks and dress shoes); De Luna ¶4 (tailored pants and ties).

[44] Mullin ¶ 3, 7, 15 (GM when Plaintiff there); Doster ¶ 3, 4 (manager when Plaintiff there); Rinofuss ¶ 4, 5, 8 (manager when Plaintiff there); Jones ¶ 4; Dommer ¶ 6; Portka ¶ 5, 7.  *See also* SE16 (over 180 current and former employee declarants averring they never understood they were required to wear Gap and in fact, wore other brands of clothing to work).

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS
CERTIFICATION  [C 06 6773 WHA]

1    Accordingly, an individual inquiry must be undertaken because it cannot be determined by

2    looking at the policies on their face whether Gap compelled employees to wear its merchandise.

3           **b.      An Individualized Inquiry is Required to Prove Any Damages**

4    Plaintiff's proposed class cannot be certified because she does not identify any objective

5    criteria for proving damages. *See Kenny*, 252 F.R.D. at 644 (denying certification; individualized

6    inquiry into "each store, each shift, each employee" needed to determine liability); *Newton v.*

7    *Merrill Lynch*, 259 F.3d 154, 187 (3rd Cir. 2001)(individual issues predominate because "whether

8    a class member suffered damages would have to be determined on a trade by trade basis, because

9    some class members would have suffered damages; while some would not"); *McLaughlin v. Am.*

10   *Tobacco Co.*, 522 F.3d 215, 223 (2nd Cir. 2008)(individual issues predominate where smokers

11   may have purchased light cigarettes for reasons other than defendant's alleged misrepresentation).

12          Plaintiff's proposed method of determining liability, a review of purchase records,

13   confirms the individualized issue.  As Gap has shown, one of the underlined primary reasons employees join

14   Gap is the discount for themselves and family members.  Employees purchase Gap clothing

15   because they want to buy and wear it, purchase merchandise which could not be worn to work,

16   for others as gifts, and pay other than with wages.  Thus, the process of reviewing purchases and

17   parsing out puchases due to alleged coercion would be impossible.  There would be no way to

18   assess damages without asking, case-by-case, why a person bought what they did and for what

19   purpose.  Moreover, given that the basis of liability would be that Gap required employees to

20   wear merchandise at work, there must be some indication that the clothing was only worn at

21   work.  Because Plaintiff has not identified any objective mechanism for determining who was

22   subjected to the requirement, who purchased because of it, which purchases were due to the

23   alleged mandate versus other reasons, and even *if* purchases were made due to the alleged

24   requirement, what resulting harm was suffered, her motion fails. *See Mazur v. eBay, Inc.*, 257

25   F.R.D. 563, 564, 567-68 (N.D. Cal. May 5, 2009)(denying certification where plaintiffs unable to

26   devise objective system for screening persons allegedly harmed).

27          **2.      The Class Action Mechanism Is Not Superior**

28   Plaintiff must establish that a class action is superior to other means of adjudication.

21

1    *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996).  A class action is not

2    superior if "each class member has to litigate numerous and substantial separate issues to

3    establish his or her right to recover individually." *Zinser,* 253 F.3d at 1192.  Here, the claims

4    require individualized mini-trials to determine what instruction each employee received, how they

5    interpreted it,, and many other individualized issues.  Indeed, even if the Court were to certify a

6    class and find liability, there must be litigation as to each employee to determine "damages."

7    Time consuming mini-trials requiring evidence of what apparel, if any, would not have otherwise

8    been purchased would be necessary.  *Brown v. Fed. Express Corp.*, 249 F.R.D. 580, 587-88 (C.D.

9    Cal. 2008)(finding no superiority: "Court would be mired in over 5,000 mini trials").

10           Just one example involving one of Plaintiff's three declarants (of over 40,000 putative

11   class members) makes this clear.  Gaffey would presumably testify, consistent with her

12   declaration, that she worked at Gap during the 2003 holiday season and earned slightly more than

13   "minimum wage."  Gaffey ¶2.  She would presumably testify that during orientation, an unnamed

14   manager (who she believes was the store manager, thus a class member) told unnamed employees

15   that they must purchase and wear Gap clothing.  *Id.* ¶3.  She would presumably testify that she

16   understood that she had to wear items from the current season, that she got in "trouble" for

17   wearing what she "believes" were Levi's jeans, and was sent home by an unspecified manager

18   (who may have also have been a class member) *Id.* ¶4.  She claims that she purchased three or

19   four outfits to "get by" and that after a few months, her shifts were cut and she quit.  *Id.* ¶5.

20           Responding to this evidence, Gap would first establish through cross examination that

21   Gaffey's recollection of events of seven years ago is highly questionable, including by

22   confronting her with documents showing that she worked only seven shifts during 12 days in the

23   weeks before Christmas in 2002, not "months" in "2003."  Gap will impeach the 'minimum

24   wage' testimony, showing that Gaffey was paid $9.00 an hour, far in excess of the $5.15 New

25   York minimum wage then in effect.  Next, Gap would establish that Gaffey has no firm

26   recollection of who allegedly explained the policy to her, what was specifically said to her about

27   it, and what written version of the policy she reviewed.  The examination will show that her

28   alleged interpretation was not credible and was unreasonable, because the policy then in effect

22

1    explicitly stated she could wear Gap-like clothing.  Gap will then likely introduce Gaffey's

2    purchase records to show that 19 out of the 21 items she purchased <u>were</u> on sale, and thus were

3    not "current items from the current season" that were supposedly required to be purchased.  Gap

4    will show that, consistent with Gaffey's statement in her application that she "loved" Gap

5    clothing, all purchases took place in the days leading up to Christmas, and that she even chose to

6    come into the store on days she didn't work to make purchases.  Geerhart Ex. A-D; Peralta ¶11.

7        Gap will then show that she purchased items in 10 separate transactions in the two weeks

8    before Christmas, and most items were not for herself.  For items Gaffey contends she bought for

9    herself, Gap will elicit testimony about whether the items could even be worn to work under the

10    applicable policy (which prohibited shirts without collars).  Gap will also examine Gaffey about

11    where else she wore the items – while socializing, to pre-holiday events, to church, to her second

12    job, or at home when not working.  Gap will also show that Gaffey made purchases from monies

13    other than her wages from Gap, such as for example, from wages from her second job.  Gap will

14    also likely establish that Gaffey wore the clothing after her 12 days of employment ended, and

15    thus obtained a substantial benefit from it, and never attempted to return any of the purchases.

16    *See* Hermle Ex. 7,  p.15:  (Ninth Circuit: "it isn't all that clear that she needed to [buy more

17    clothes], that she ever had the opportunity to wear any of the clothes that she actually bought.

18    She could have returned them.")

19        Gap will examine Gaffey on communications she had with other employees about the

20    dress code, and on what basis, given her 12 days of employment in one store, she can assert that

21    "all" employees followed Gap's policy "and purchased Gap clothing to wear to work."  Gap will

22    then turn to the alleged incident in which Gaffey was sent home for wearing Levi's jeans to

23    determine who allegedly sent Gaffey home and the specifics of the conversation.  Gap will

24    establish that the issue was more likely that the jeans were ripped, torn, dirty or wrinkled, or that

25    Gaffey was actually sent home for some reason having nothing to do with what she was wearing.

26    Gap will then call other witnesses, including, potentially, managers who may have been in a

27    position to have given the alleged direction, to rebut Gaffey's testimony and supposed

28    understanding.   Depending on who allegedly gave the instruction, Gap may be entitled to submit

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO  MOTION FOR CLASS
CERTIFICATION  [C 06 6773 WHA]

1   evidence that the individual was not authorized to bind the company to a version of the policy

2   contrary to that authorized and distributed by Gap.  Finally, Gap will establish that Gaffey

3   stopped showing up for work the day after Christmas, likely because she no longer wanted or

4   needed her generous purchase discount, and that it terminated her employment for job

5   abandonment (in contrast to her allegation that her shifts were cut back).**45**  Of course, virtually

6   *none* of this evidence, whether produced on direct or cross examination, will be representative of

7   the circumstances of other Gap employees in other stores who received different orientations in

8   other years from other managers with other versions of the dress code policy.  And all of it

9   confirms the lack of superiority of the class action process for litigation of these claims.

10        There are other options for resolution of these highly individualized allegations.  New

11   York has efficient and effective administrative processes to handle such claims through filings

12   with the New York State Attorney General or Department of Labor, which are accessible online,

13   via telephone or by mail.  *Matthews v. Book-of-the-Month Club,* 62 F.R.D. 479, 480 (N.D. Cal.

14   1974)(denying certification where suits available under statutory scheme); *Alix v. Wal-Mart*

15   *Stores, Inc.,* 868 N.Y.S.2d 371, 376 (2008)(affirming denial of certification of wage violations for

16   lack of superiority; remedy with N.Y. Department of Labor available).  Here, Plaintiff never

17   attempted to file a complaint with any New York agency.  Perry Ex. 2, 12:2-13:14.  When the

18   burden of conducting thousands of mini-trials is weighed against the streamlined administrative

19   process established to resolve these types of claims at no cost to the employee, it is obvious that a

20   federal trial (held over 3,000 miles away from the New York witnesses) simply cannot be a

21   superior remedy.

22        **D.    Plaintiff Has No Class Action Trial Plan**

23        Perhaps not surprisingly, Plaintiff fails to identify any trial plan whatsoever for litigation

24

25   **45** Similar mini-trials will be needed with Maldonado and German.  There, Gap will show that
26   Maldonado misspelled both her first and last name, made only one purchase (which also included
     sale items), and abandoned her job after working only 3 shifts (in 2003, not in 2006 as she
27   claims).  Next, with respect to German, Gap will show she worked for seven months, not the 10
     she claims, ***didn't make a single purchase***, and abandoned her job after receiving a warning.  *See*
28   *also* Motion to Strike/Objections to Evidence; Geerhart Exs. F, G, K, L; Peralta ¶11.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS
CERTIFICATION  [C 06 6773 WHA]

1   of these claims.  But certification is only proper when plaintiff demonstrates a "suitable and

2   realistic plan for trial of the class claims."  *Zinser*, 253 F.3d at 1189; *see also Valentino*, 97 F.3d

3   at 1234 (no cert.: "no showing by plaintiffs of how the class trial could be conducted"); *Robinson*

4   *v. Texas Auto. Dealers Ass'n,* 387 F.3d 416, 425 (5th Cir. 2004)(courts cannot use "figure it out

5   as we go along approach").  Given the individualized inquiries here, the omission is particularly

6   problematic. *Goldberg v. Kelly,* 397 U.S. 254, 269 (1970)("where important decisions turn on

7   questions of fact, due process requires an opportunity to confront and cross-examine").  Gap has

8   the right to present a full defense and "must be allowed to present any rebuttal evidence [it]

9   choose[s], including evidence that there was no [liability to] one or more members of the class."

10  *Western Elec. Co., Inc. v. Stern*, 544 F.2d 1196, 1199 (3d. Cir. 1976).[46]

11  ## IV.   CONCLUSION

12       Any class claim which depends so heavily on the interpretation of oral instructions from

13  thousands of individuals (which conflict with lawful written instructions) is devoid of

14  commonality.  The mountain of evidence rebutting Plaintiff's clearly confirms this problem.

15  Moreover, the paucity of Plaintiff's showing confirms the concern Judge Berzon recognized early

16  in the course of this case when she stated: "What I'm really concerned about is we're going to go

17  through a complicated statutory analysis ….and we're going to find out that there's no 'there'

18  there in the end after discovery."  There's no there here.  Certification should be denied.

19

20  Dated: October 15, 2009                     LYNNE C. HERMLE
21                                              JESSICA R. PERRY
                                                JULIA COLLINS RIECHERT
22                                              ORRICK, HERRINGTON & SUTCLIFFE LLP

23                                              _____/s/_____
24                                                        Jessica Perry
                                                   Attorneys for Defendant
25                                                        Gap Inc.

26

27  [46] It would obviously not be proper for Plaintiff to produce a trial plan for the first time in her
    Reply papers, and Gap would object to any such introduction of contentions at that stage of the
28  briefing of this matter.